## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**QBE SEGUROS**,
    Plaintiff,

    v.

**CARLOS A. MORALES-VÁZQUEZ**,
    Defendant.

Civil No. 15-2091 (BJM)

## OPINION IN A NON-JURY TRIAL

QBE Seguros ("QBE") brought this action under the court's admiralty jurisdiction against Carlos Morales-Vázquez ("Morales"), seeking a judgment declaring that Morales's marine insurance policy is void *ab initio* under the doctrine of *uberrimae fidei*, that Morales breached the "warranty of truthfulness" in the application for the insurance policy, thereby excusing QBE from making any payments to Morales on the policy, or that the policy does not cover all of Morales's claimed losses. Docket No. 14 ("Compl."). Morales counterclaimed, alleging breach of contract and entitlement to consequential damages due to QBE's bad-faith adjustment. Docket No. 15. I denied both parties' motions for summary judgment. Docket No. 134. The case then proceeded to a six-day nonjury trial. Transcripts were prepared. Docket Nos. 194, 196, 197, 203, 204, 207, 208, 211. The parties submitted post-trial briefs. Docket Nos. 212, 213. The case is before me on consent of the parties. Docket No. 47. In light of the findings of fact and legal discussion set forth below, QBE's action for declaratory judgment is **GRANTED**, and Morales's action is **DISMISSED**.

## FINDINGS OF FACT

1. In 2011, Morales applied for and received insurance policy OYP-0000746-00 from Optima Insurance Co. for a 2005 Riviera ("Optima Application). Exhibits M, O. In the Optima Application, Morales did not answer the questions that asked him to describe any prior boating history and "any accidents, claims or losses in connection with any vessel you have sailed, owned or was under your control." Exhibit M. Policy OYP-0000746 was renewed multiple times. Exhibits P, R, HH.

2.  QBE is a Puerto Rico corporation authorized by the Puerto Rico Insurance Commissioner's Office to sell ocean marine insurance. It acquired Optima Insurance Co. in 2012.

3.  In March 2014, Morales applied for insurance from QBE for his 48' Cavileer yacht ("QBE Application"). Joint Exhibits II, X.

4.  The application form ("QBE Application") states that the "statements and answers provided [in the application] are warranted by [the applicant] to be true and correct." Joint Exhibit II. The QBE Application also states, "If incorrect answers are provided (either by error, omission or neglect), I will be in breach of this warranty and the policy, if issued, will be void from inception. I understand I must fill out every question and that no question should remain unanswered. If a question is inapplicable, I am aware that I must write "N/A" to so indicate. I agree that this declaration shall form the basis of the contract of insurance between me and you. I also agree that if the policy is issued, it was issued by you based upon and in reliance of the truthfulness and completeness of the answers provided herein." Joint Exhibit II. The declarations section of the QBE Application states, "All questions asked herein request material information which is indispensable for QBE Optima Insurance Company's assessment of the risk subject of this application." Joint Exhibit II.

5.  Section seven of the QBE Application asked, "Have you had any accidents or losses (even if no insurance claim was filed) in connection with any vessel you have operated, owned or was under your control? If yes please provide full details, including dates and amounts paid." Morales checked the box for yes and wrote, "Accident 11 years ago – propeller strike in Las Pelás at Culebra. Propellers were replaced, shaft and rudders rectified." Joint Exhibit II. Morales did not include the fact that he grounded a 40' Riviera Offshore yacht in January 2010 in Fajardo. Joint Exhibits II, X; Transcript 06-28-18 AM at 4:3–5.

6.  Section six of the QBE Application required Morales to "give details of boating experience by providing, in chronological order, list of boats owned or operated." Joint Exhibit II. In answer to the question, Morales listed only two of the seven vessels that he had owned and operated. He listed a 2001 40' Riviera 4000 Offshore and a 2005 40' Riviera Sport Fisherman. He did

not list a small speedboat with a 35 h.p. engine; a 19' Cobia with a 175 h.p. outboard engine, a Yamaha Jet Boat, a 29' Trophy with twin 225 h.p. outboards; and a 50' Cherokee speedboat powered by diesel engines. Transcript 06-28-18 AM at 18:18–20:2.

7. Morales's digital signature is on the QBE Application. Transcript 06-28-18 AM at 15:6–18.

8. Angel Cruz-Rodriguez submitted Morales's QBE Application to Eribel Casado, an underwriter at QBE, via email. Exhibit W. He wrote that the application was "completed" and that he needed the "premium as soon as possible to make the policy today." Exhibit W.

9. Casado testified that after Cruz sent her Morales's QBE Application, she "evaluated the application from beginning to end" and decided that the risk was "within my authority and capacity[.]" Transcript 6-25-18 at 69:20–25.

10. When deciding whether to issue a quote, underwriters use the Underwriting Guidelines, underwriting worksheets in Excel, and their experience and judgment. Transcripts 6-25-18 at 77:4–17; 6-26-18 AM at 10–12, 48:2–15, 49:1–3.

11. In the underwriting Excel worksheet, it noted that Morales had "more than 15 years" of "owner experience." Joint Exhibit IX.

12. QBE's Underwriting Guidelines, which are used to guide underwriters deciding whether to issue a quote, are "intended to provide exhaustive knowledge about our underwriting guidelines, their interpretation and application to various risks and marinas." Joint Exhibit IV. The Underwriting Guidelines present a list of "minimum information needed in order to quote"; the list does not include the insured's prior losses or boating history. Joint Exhibit IV; Transcript 6-26-18 AM at 48:2–4.

13. Casado testified that "there are other determining factors for you to evaluate a risk [other than what is listed in the guidelines], such as experience and the underwriter's judgment. In this case, prior losses or experience of the prospect are parts of the underwriter's evaluation criteria" because the insurance company could accept or decline the risk or change the amount of the premium based on the prospect's prior losses. Transcript 6-26-18 AM at 48:7–15.

14. Although Morales did report the propeller strike on the QBE Application, the grounding in Fajardo in 2010 was a very different claim. A grounding is a significant loss for this type of insurance and its existence is important in deciding whether to accept the risk or not. Transcript 6-26-18 AM at 46:13–47:6.

15. Thirty-six minutes after receiving Cruz's email, Casado emailed Cruz back and attached a quote for a policy that she "quoted basing [herself] on policy OYP-0000746-02." Exhibit W.

16. Later that day, QBE issued Morales policy OYP-00001077-00 for March 7, 2014 through March 7, 2015. Joint Exhibit I. Following an endorsement, Morales held hull insurance for $550,000 for Making Waves from QBE as well as P&I, medical payments and uninsured boater's coverage, pursuant to all its terms, conditions, limitations and exclusions. Joint Exhibit I; Exhibits J, X, AAA; Docket No. 164 at 68 ("Stipulated Facts").

17. On October 24, 2014, Making Waves sustained damages as a result of a fire, and Morales alerted QBE to the damage. Joint Exhibit X; Stipulated Facts at 68

18. QBE appointed an independent adjustor, Pablo Rios, to investigate and adjust Morales's claim for Making Waves. Transcript 6-28-18 PM at 15:6–11, 21:1–5. Of QBE's employees, Jose Soto, QBE's Vice President of Claims, and Maria Berrios, a property adjustor, also worked on the claim. Transcripts 6-25-18 at 19:3–13, 24:17–25; 7-13-18 at 13:11–14. Berrios was in charge of coordinating meetings, processing documents, and evaluating reports related to the claim. Transcript 7-13-18 at 13:14–17.

19. Rios submitted his first report to QBE on October 28, 2014 after visiting Making Waves. Exhibit DD; Transcript 6-28-18 PM at 25:13–26:10.

20. Rios then hired Edgardo Jimenez, a marine surveyor, to assess the physical condition of Making Waves and to provide an opinion on the cost of repairs. Transcripts 6-26-18 at 6:19–21; 6-25-18 at 25:6–8, 56:2–5; 6-28-18 PM at 25:1–6.

21. In late November 2014 (between November 21 and 26), Soto, Cruz, and Morales met to discuss the claim related to the fire on Making Waves. Joint Exhibit X. During the meeting, Cruz or

Morales told Soto that had this claim been made to MAPFRE, it would have already been resolved. Transcripts 6-25-18 at 30:17–22; 6-28-18 AM at 38:1–4.

22. On November 24, 2014, Jimenez issued a Damage Survey Report after inspecting Making Waves three times. Joint Exhibit VIII. The report included an estimate of damages based on discussions with other industry professionals and a contractor's similar jobs. Transcript 6-26-18 at 24:1–13.

23. On December 4, 2015, QBE made its first offer to Morales of $63,774.10 based on Jimenez's report, which Morales rejected the next day. Joint Exhibit X.

24. QBE asked the adjustors and surveyors to keep working on the case to see if they missed anything or if another adjustment could be made. Transcript 6-25-18 at 26:23–27:3.

25. On February 27, 2015, QBE and Morales met again to discuss their difference in opinion on how the electric cables in Making Waves should be repaired and whether there needed to be further tests for potential delamination on the vessel that could have been caused by the fire. Joint Exhibit X; Transcript 6-28-18 AM at 41:24–42:2.

26. On March 21, 2015, QBE made a second offer to Morales of $66,258.03. Joint Exhibit X. The offer increased because QBE received an invoice regarding the emergency management of the fire that increased the expenses. Transcript 6-25-18 at 27:4–15. Morales rejected the offer. Transcript 6-25-18 at 27:16–18.

27. On April 14, 2015, QBE made a third offer to Morales of $113,406, which was then re-stated on May 4, 2015. Joint Exhibit X. The offer was based on an estimate completed by Island Marine, which had agreed to do the repairs for Making Waves for that same amount of money (minus deductibles and depreciation). Joint Exhibit V; Exhibit 31; Transcript 6-28-18 at 28:11–20. Morales rejected the offer. Transcript 6-28-18 at 29:5–30:2.

28. QBE also sought a second repair estimate from Island Marine to see how much it would cost to conduct the repairs in the way that Morales wanted. Joint Exhibits VI; Transcript 7-13-18 at 24:13–25:12.

29. QBE's position from the beginning of the loss adjustment process was that if any hidden damages appeared that were not contemplated in the original offer, that QBE would evaluate them after they were corroborated. Transcript 7-13-18 at 27:20–28:6. Rios told this to Morales. Transcript 6-28-18 PM at 42:24–43:1.

30. On May 7, 2015, Morales met at QBE with Soto, Berrios, Jimenez, Rios, Cruz, and an engineer who Morales brought. Joint Exhibit X; Transcript 06-25-18 at 32:7–10, 48:11–49:4.

31. After Morales, Cruz, and the engineer left the meeting, Edgardo Jimenez told Soto, Berrios, and Rios that he had heard from a colleague of an alleged prior recent grounding by Morales. Joint Exhibit X. Soto told Rios to investigate the alleged grounding to determine if it was true. Transcripts 6-25-18 at 32:14–16, 51:4–12; 6-28-18 PM at 45:13–17. Soto wanted the grounding investigated because he knew it could lead to the annulment of Morales's policy. Transcript 6-25-18 at 33:7–13, 52:14–53:25.

32. Rios understood that he should report back to QBE when he had the information. Transcript 06-28-18 PM at 50:23–51:1. Between receiving the assignment and reporting his findings to QBE, Rios took a month-long vacation. Transcript 06–28–18 PM at 46:4–21.

33. As part of his investigation, Rios contacted Sea Tow and other contractors at Marina Puerto del Rey. Transcript 6-28-18 PM at 47:17–22. Sea Tow, which had done the salvage of the grounded vessel, confirmed the grounding. Transcript 6-28-18 AM at 22:7–20, 55:1–56:8. By the time Rios spoke with Javier Menendez of Sea Tow, Rios already knew that Morales had a previous insurance claim with MAPFRE, which Menendez confirmed. Transcript 6-28-18 AM at 58:7–61:9.

34. Rios sent an email to Soto on July 10, 2015, confirming the 2010 grounding. Joint Exhibit X; Exhibit BBB. QBE then contacted its attorneys and summoned Morales for an Examination Under Oath. Transcript 6-25-18 at 34:20–23.

35. Between the May 7 meeting and Rios's email on July 10, QBE continued working on adjusting Morales's claim, including seeking a new estimate from an electrician. Transcript 06-27-18 at 18:4–19:23, 20:12–15, 23:6–11.

36. On August 7, 2015, QBE examined Morales under oath. Joint Exhibit X. When questioned by QBE, Morales admitted under oath that he owned or operated five vessels that he did not include in the QBE Application and that he did not disclose the 2010 grounding. Joint Exhibit III; Transcript 6-29-18 at 40:6–14, 47:2–23

37. On August 10, 2015, QBE informed Morales that it was rescinding his policy and offered to return the premium. Joint Exhibit X; Stipulated Facts at 69.

38. Cruz has worked as an insurance agent for thirty-two years and holds an authorized representative license. Exhibit K; Transcript 06-28-18AM at 64:16–19, 65:15–67:6.

39. In 2014, Colonial Insurance Agency ("Colonial") was the general agent of QBE as well as other insurance companies such as AIG, ACE, and USIC. Transcript 6-29-18 at 17:18–23; Stipulated Facts at 69. Cruz placed Morales's QBE Application with Colonial, which received and processed Morales's QBE Application. Transcript 6-29-18 at 6:24–7:1; Stipulated Facts at 69. In 2014, Rafael Padial was the President of Colonial. Transcript 6-29-18 at 4:11–13. Padial could not find Cruz's authorized representative license on file at QBE, Optima, or Colonial nor any document that reflected that he had been an agent authorized by QBE before 2016. Transcript 6-29-18 at 12:22–13:2, 19:7–24. Cruz also testified that he did not have a written authorized representative agreement with QBE. Transcript 6-28-18 PM at 4:22–24, 9:5–7.

40. Colonial had a "Producer Commission Statement" for Cruz that reflected his commissions, payments, and deductions; it was an account of Cruz's rolling account with QBE. Exhibit YY; Transcript 6-29-18 at 16:9–17:3. It also had a general ledger reflecting the transactions related to business produced by Cruz at Colonial from 2006–2016. Exhibit E; Transcript 6-29-18 at 6:24–7:1, 14:23–15:11. Padial explained that if Cruz was transacting business from 2006–2016 then he would have had an authorized representative license in effect during that time as well. Transcript 6-29-18 at 15:21–15:24.

41. Cruz did not call anyone at QBE when he received the subpoena to testify because, as he explained, "I don't know anybody at QBE." Transcript 6-28-18 PM at 11:1–5. Cruz barely

does business with QBE. He does not know anybody in QBE's claims department. Transcript 6-28-18 PM at 10:19–22.

42. Cruz works with "almost all the companies in Puerto Rico" including MAPFRE, Universal, QBE, Integrand, and Multinational (formerly National Insurance). Transcript 6-28-18 AM at 68:4–20.

43. Cruz started doing business with QBE because insurance agents, like himself, are "always looking for options for our clients." Transcript 6-28-18 AM at 69:9–12 He wants to make sure that his clients, like Morales, get the best coverage and the best terms in the insurance market, which is why he negotiates with different insurance companies to get his clients the best deal possible. Transcript 6-28-18 PM at 6:9–21. Cruz considers the insurance companies his clients as well as Morales. Transcript 6-28-18 PM at 6:9–12.

44. Cruz's self-described role in the application process for insurance is to provide advice to the insured and help in completing the application. Transcript 6-28-18 AM at 71:4–10. In terms of the claims process, Cruz "speak[s] with the insured, and I take the details of the claim, and I forward that to the insurance company." Transcript 6-28-18 AM at 71:11–15. When receiving an insurance claim, Cruz is representing the insured. Transcript 6-28-18 AM at 71:16–72:11.

45. Throughout Berrios's emails to Rios, Soto, Jimenez, Morales, and Cruz, Berrios always differentiated Rios, Soto, Jimenez, and herself as representatives of QBE, and Cruz and Morales as representatives of the insured. Exhibit 10; Transcript 7-13-18 at 14:18–15:1, 16:7–23:17. Cruz was not invited to internal QBE meetings nor did anyone ask Berrios to invite Cruz. Transcript 7-13-18 at 18:1–15, 20:10–15.

## DISCUSSION

QBE alleges that Morales made two material misrepresentations in his application to QBE for insurance for his vessel: it contends that Morales misrepresented his prior boating history and his prior loss history. Compl. ¶ 17. Misrepresentation is "the act or an instance of making a false or misleading assertion about something, usu[ally] with the intent to deceive. Misrepresentation, Black's Law Dictionary (10th ed. 2014).

Within federal maritime law, there are at least two doctrines that excuse an insurer from paying on a policy where the insured misrepresented facts. The first, *uberrimae fidei*, or the duty of utmost good faith, is unique to maritime law. *Catlin at Lloyd's v. San Juan Towing & Marine*, 778 F.3d 69, 75 n.6 (1st Cir. 2015) (explaining that although at one time good faith was a requirement in contract law, it now only exists in maritime insurance). To prove a breach of the duty of utmost good faith, the insurer must show that the insured misrepresented a material fact. *Id.* at 83. Materiality is judged based on an objective standard. *St. Paul Fire & Marine Ins. Co. v. Halifax Trawlers, Inc.*, 495 F. Supp. 2d 232, 240 (D. Mass. 2007). Equitable affirmative defenses are not available. *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000).

The second doctrine is based in federal contract law and is applicable where the contract between the parties includes a warranty of truthfulness. If the contract does include a promissory warranty of truthfulness, then the insured's misrepresentation of fact in that contract will also excuse the insurer from paying on the policy. *See Markel Am. Ins. Co. v. Leonor Veras*, 995 F. Supp. 2d 65, 77 (D.P.R. 2014) (finding the language of the insurance policy contained a warranty of truthfulness and that the defendant's misrepresentations had breached that warranty). To prove a breach of the warranty of truthfulness, the insurer must show that the insured misrepresented a fact. *Leonor Veras*, 995 F. Supp. 2d at 77. The contract itself controls any interpretation of the contract terms. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31–32 (2004). Equitable affirmative defenses are available. *Suydam v. Reed Stenhouse of Washington, Inc.*, 820 F.2d 1506, 1510 (9th Cir. 1987); *Natures Way Marine, LLC v. Everclear of Ohio, Ltd.*, 37 F. Supp. 3d 1232, 1242 (S.D. Ala. 2014), *amended*, No. 1:12-CV-316, 2014 WL 5465885 (S.D. Ala. Oct. 28, 2014).

Morales argues that QBE cannot annul the policy under *uberrimae fidei* because it cannot prove the required elements, or under the warranty of truthfulness because Morales can prove the affirmative defenses of waiver and equitable estoppel. Docket No. 213. Morales also avers that QBE delayed the adjustment of his claim in violation of the Puerto Rico Insurance Code and engaged in bad faith post claim underwriting, both of which entitle him to reasonable attorneys' fees. *Id.*

**Uberrimae Fidei**

"This dispute concerns a marine insurance contract and therefore is governed by the principle of *uberrimae fidei,* or utmost good faith." *St. Paul Fire & Marine Ins. Co. v. Abhe & Svoboda, Inc.*, 798 F.3d 715, 719 (8th Cir. 2015). *Uberrimae fidei* requires the insured "to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging of the value of the risks." *State Nat. Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1351 (S.D. Fla. 2011) (quoting *Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510–11 (1883)). Accordingly, under this "strict maritime rule," the "insured must make full disclosure of all material facts of which the insured has, or ought to have, knowledge . . . even though no inquiry be made." *Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc.*, 974 F. Supp. 2d 64, 78 (D.P.R. 2013) (quoting *Grande v. St. Paul Fire & Marine Ins. Co.,* 436 F.3d 277, 283 (1st Cir. 2006)). Otherwise, the policy is voidable. *Catlin at Lloyd's*, 778 F.3d at 83; *see Sealink, Inc. v. Frenkel & Co.*, 441 F. Supp. 2d 374, 386 (D.P.R. 2006). The doctrine places a "high burden" on the insured as "[i]t is of no consequence whether the insured's misrepresentation or nondisclosure occurred due to fraud, negligence, accident, or mistake." *Catlin (Syndicate 2003) at Lloyd's*, 974 F. Supp. 2d at 78 (internal quotations omitted).

Morales argues that the test for *uberrimae fidei* is two-pronged: the misrepresented or non-disclosed fact must be material, and the insurer must have relied on the misrepresentation or omission in issuing the policy. *See Docket No. 213 at 33* (citing precedent from the Eighth, Second, and Fifth Circuits). However, as I previously explained in my order denying summary judgment, Docket No. 134, the First Circuit's binding precedent does not require actual reliance as part of the analysis. *Catlin at Lloyd's*, 778 F.3d at 82. Instead, the First Circuit simply requires materiality: "Under *uberrimae fidei*, when the marine insured fails to disclose to the marine insurer *all* circumstances known to it and unknown to the insurer which 'materially affect the insurer's risk,' the insurer may void the marine insurance policy at its option." *Id*. at 83 (internal citations omitted). In its implementation of its own test, the First Circuit found that the insurer "*could have* reasonably" made assumptions and evaluations based on the insured's failure to disclose the true

value of the vessel. *Id*. at 82 (emphasis added). Notably, the court did not ask whether the insurer actually did make its evaluations based on the false value of the vessel, only that it could have. Therefore, this court is also bound to consider only the materiality of Morales's non-disclosures as opposed to what information QBE actually relied upon in choosing to issue a policy.

Morales alternatively argues that QBE "expressly incorporated the element of reliance into its policy and applications." Docket No. 213 at 38. Courts have found that parties may "'contract around' state or federal law with regard to an insurance contract" as long as it does not violate public policy or statutory law. *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1542 (11th Cir. 1990). In *King v. Allstate Insurance Company*, the Eleventh Circuit held that the insurance policy's statement, "[t]his policy is void if you intentionally conceal or misrepresent any material fact" represented the parties' intention to contract around federal law that otherwise would not have required intent, and thus the parties had created their own standard that the insurance company was bound to follow in seeking to annul the policy. 906 F.2d at 1539, 1542. *But see New Hampshire Ins. Co. v. C'Est Moi, Inc.*, 519 F.3d 937, 939 (9th Cir. 2008) (insurance policy language that coverage "shall be voided if [CMI] intentionally conceal[s] or misrepresents any material fact" was not specific enough supersede the doctrine of uberrimae fidei because "only 'an unambiguous statement' in the policy, purporting to supersede the doctrine in express terms, would be sufficient to accomplish that purpose" (quoting T. Schoenbaum, *The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law*, 29 J. Mar. L. & Com. 1, 13 (1998))).

Leaving aside whether the language presented to both the Eleventh and Ninth Circuits was sufficiently specific to supersede the doctrine of *uberrimae fidei*, the language presented by Morales clearly does not come close to that threshold. As Morales states, both the QBE Application and the subsequent policy state that the policy is issued "based upon and in reliance of the truthfulness of the answers provided herein." Joint Exhibits I, II; Docket No. 213 at 34. However, on the QBE Application two lines above that statement is the separate explanation of what actions would cause the policy to be void, and nowhere in that description does it state that QBE had to

have relied on the incorrect answer for the policy to be voided. Joint Exhibit II. Unlike in *King v. Allstate Insurance Company* where the insurance policy explicitly stated that it would only be voided if the insured intentionally concealed a fact, here the QBE Application (and policy with comparable language) does not explicitly state that it would be voided only if the insured omitted a fact that QBE relied upon. In a similar situation, another court explained:

> [W]e doubt whether the longstanding maritime doctrine can be modified by contract simply by pointing to the boilerplate 'knowledge and belief" certification on an application, as opposed to an actual provision within the policy itself that defines and narrows the duty of disclosure as was the case in *King*. . . . Given how entrenched the doctrine is in the maritime insurance context, it seems to us that a much more explicit and unambiguous contractual modification would have to be enacted to modify the traditional test.

*State Nat. Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1352 n.3 (S.D. Fla. 2011). Morales's argument that the word "reliance" in the QBE Application and policy represents the intention of the parties to contract around the doctrine of *uberrimae fidei* therefore fails. The question instead is whether Morales "fail[ed] to disclose to [QBE] *all* circumstances known to [him] and unknown to [QBE] which materially affect [QBE]'s risk[.]" *Catlin at Lloyd's*, 778 F.3d at 83 (internal quotations omitted).

A fact is material if it "can possibly influence the mind of a prudent and intelligent insurer in determining whether it will accept the risk." *Halifax Trawlers, Inc.*, 495 F. Supp. 2d at 240 (quoting *Commercial Union Ins. Co. v. Pesante*, 459 F.3d 34, 38 (1st Cir. 2006)); *see Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 282 (1st Cir. 2006) (material means "something that affects the risk and might lead either to a higher premium or a refusal of insurance"); *RLI Ins. Co. v. JDJ Marine, Inc.*, No. 07-CV-9546, 2012 WL 3765026, at *5 (S.D.N.Y. Aug. 29, 2012) ("[A] material omission exists where the insurer would decide to not issue a policy, or to issue a policy charging a higher premium, if it was aware of the insured's nondisclosure."); *see also Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510–511 (1883) ("[W]hen any circumstance is withheld, however slight and immaterial it may have seemed to himself, that, if disclosed, would probably have influenced the terms of the insurance, the concealment vitiates the policy."). When

determining materiality, "[t]he standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986).

Casado, QBE's underwriter, testified that prior loss history is an important factor to take into consideration when evaluating the risk posed by issuing a particular policy. As she explained, "prior losses or experience of the prospect are parts of the underwriter's evaluation criteria. We could offer a higher premium or a lower premium or accept or decline a risk, depending on the prior losses that the prospect has had." Transcript 6-26-18 AM at 48:11–15. And, specifically, to this case, Casado explained that the loss reported by Morales—a propeller strike—was a very different claim than the grounding in Fajardo in 2010 such that the disclosure of the former did not excuse the nondisclosure of the latter: "a grounding is definitely a significant loss for this type of insurance . . . [it] is definitely important information in deciding whether to accept the risk or not." Transcript 6-26-18 AM at 46:13–47:6; *see Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 688 (S.D.N.Y. 2008), *aff'd sub nom. Fed. Ins. Co. v. Keybank Nat. Ass'n*, 340 F. App'x 5 (2d Cir. 2009) ("Federal has failed to convince the Court that its own underwriters considered any of the alleged misrepresentations or nondisclosures to be material, a fact that, while not dispositive, plainly bears on the determination of what an objective insurer and an objective insured would have considered material."). No witnesses contested Casado's explanation of the importance of prior loss to an underwriter's assessment. In addition, by signing the QBE Application, Morales acknowledged that "[a]ll questions asked herein request material information which is indispensable for QBE Optima Insurance Company's assessment of the risk subject of this application." Joint Exhibit II. This not only supports QBE's argument that prior loss history is a material fact to them, but it also means that a reasonable person in Morales's position would know that prior loss history, as a question asked on the QBE Application, was material.

To be sure, Morales argues that QBE's actions and guidelines demonstrate that prior loss history was not material to QBE. First, Morales cites *Kantrowitz v. Paul Revere Life Insurance Company* for the proposition that an insurer must "present documentation concerning its

underwriting policies such as its underwriting manuals" that prove that it considered a particular fact material to its assessment. Docket No. 213 at 31 (citing No. 95-CV-2204, 1997 WL 128463, at *4 (S.D.N.Y. March 19, 1997)). However, the court in that case was applying New York law, which is not applicable here. Federal law, on the other hand, does not require that the insurer provide written proof. *See AIG Centennial Ins. Co. v. O'Neill*, No. 09-60551-CIV, 2013 WL 10450139, at *17 (S.D. Fla. May 9, 2013), *aff'd on other grounds*, 782 F.3d 1296 (11th Cir. 2015) (direct testimony of witnesses attesting that "a valid disclosure of prior losses could have affected the terms of the Policy . . . is all that is required" to prove materiality); *St. Paul Fire & Marine Ins. Co. v. Halifax Trawlers, Inc.*, 495 F. Supp. 2d 232, 240 (D. Mass. 2007) (underwriting manager's statement that knowledge of damage to the insured's vessel was material and "highly relevant" was sufficient to prove materiality such that no reasonable juror could find otherwise).

Morales correctly points out that QBE's Underwriting Guidelines, which are used to guide underwriters deciding whether to issue a quote, state that they are "intended to provide exhaustive knowledge about our underwriting guidelines, their interpretation and application to various risks and marinas" and yet do not mention prior loss history as a factor to consider. Joint Exhibit IV. Although the description of the guidelines suggests that it is intended to be exhaustive, the section on what underwriters should consider when issuing a quote states that it is only a list of the "minimum information needed." Joint Exhibit IV. The fact that the guidelines represent the minimum information required was bolstered by Casado's testimony: she explained that when deciding whether to issue a quote, underwriters use the Underwriting Guidelines, QBE's underwriting worksheets in Excel, and their experience and judgment. Transcripts 6-25-18 at 77:4–17; 6-26-18 AM at 10–12, 48:2–15, 49:1–3. Therefore, despite the contradictory language in the guidelines, I find that QBE has proved that prior loss history "could possibly influence the mind of a prudent and intelligent insurer in determining whether it will accept the risk." *Halifax Trawlers, Inc.*, 495 F. Supp. 2d at 240 (quoting *Commercial Union Ins. Co. v. Pesante*, 459 F.3d 34, 38 (1st Cir. 2006)).

Moreover, it is entirely logical that an insured's loss history would affect their premiums and whether an insurance company would want to accept the risk of issuing them a policy; it is similarly logical that Morales would have understood that his prior loss history could have affected the terms of his policy. *See id.* (acknowledging that while the court is not "an expert in the field of boat construction[,]" the materiality of the incident was clear); *see also Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222–23 (9th Cir.1995) (maritime insurance applicant's loss history was a material fact); *Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc.*, 979 F. Supp. 2d 181, 190 (D.P.R. 2013), *aff'd as modified sub nom. Catlin at Lloyd's v. San Juan Towing & Marine*, 778 F.3d 69 (1st Cir. 2015) ("[I]nformation about loss history is material to an evaluation of the risk."); *AIG Centennial Ins. Co.*, No. 09-60551-CIV, at *15–16 (listing cases that demonstrate that "[c]ourts in the Eleventh Circuit have held that a misrepresentation as to loss history is material to the underwriting of a marine insurance policy" and reaching the same conclusion itself); *Great Lakes Reinsurance PLC v. Arbos*, No. 08-20439-CIV, 2009 WL 8642003, at *5 (S.D. Fla. Jan. 6, 2009) ("[A] prospective insured's loss history is undoubtedly material, as it might have a bearing on the risk to be assumed by the insurer.").

Morales did not make a full disclosure of all material facts known to him when he sought maritime insurance from QBE. Morales argues, though, that the material fact known to him—the grounding in 2010—was also known by QBE because its alleged agent, Cruz, knew of the grounding. Cruz was involved in the adjustment by MAPFRE of the 2010 grounding and consequently was aware of its existence. Transcript 06-28-18 AM at 75:17–76:6, 89:3–24. Therefore, the question is whether Cruz is an agent of QBE such that his knowledge is imputed to QBE.

With no specific federal rule governing agency-principal law in the context of maritime insurance contracts, Puerto Rico law dictates whether Cruz is an agent of QBE. *See Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004); *Suydam*, 820 F.2d at 1509 (9th Cir. 1987) (applying Washington law to question of agency relationship). An agent is a person who has contracted "to render some service, or to do something for the account or at the request of another." 31 L.P.R.A.

§ 4421. The principal's offer of authority may be express or implied, inferred "from the acts of the principal, from acts or deeds which manifestly reveal such declaration of consent necessarily implying, evidently and clearly, the intent to be bound." *Bank of Nova Scotia v. Vélez Rullán*, 91 P.R.R. 347, 353, 91 D.P.R. 358 (1964) (citing 31 L.P.R.A. § 4422); *see CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 75 (D.P.R. 2006). The agent's acceptance of authority "may also be express or implied, the latter being inferred from the acts of the agent." 31 L.P.R.A. § 4422. When an agent-principal relationship exists, "[a]n agent is bound to perform services at the request of his principal, P.R. Laws Ann. tit. 31, § 4421, and the principal implicitly delegates the necessary authority to the agent to administer property that is essential to the agency." *Gonzalez-Gonzalez v. United States*, 581 F. Supp. 2d 272, 280 (D.P.R. 2008) (citing *Velez Rullan*, 91 P.R. at 353–54, 91 D.P.R. 358). Consequently, "it is reasonable to impute the agent's knowledge of pertinent facts to his principal." *Id*.

Here, the evidence does not support a finding that Cruz was QBE's agent. The evidence proves that Cruz holds an authorized representative license and did so at all relevant times during this case. Exhibit K; Transcript 06-28-18AM at 64:16–19, 65:15–67:6. However, the evidence is equally clear that Cruz was not an authorized representative for QBE. Under Puerto Rico law, an authorized representative is defined as "a producer that *subscribes a contract* with an insurer to negotiate insurance on his behalf, be it as employee or as independent contractor." P.R. Laws Ann. tit. 26 §949b (emphasis added). Furthermore, "No producer may act as authorized representative of an insurer, unless he/she subscribes a contract with the insurer through which the insurer authorizes the producer to negotiate insurance on behalf and in representation of the insurer." P.R. Laws Ann. tit. 26 §949l(1). The testimony of both Padial and Cruz shows that Cruz never had a contract with QBE. 1. Transcripts 6-29-18 at 12:22–13:2, 19:7–24; 6-28-18 PM at 4:22–24, 9:5–7. In addition, there is no evidence that either QBE or Cruz notified the Office of the Insurance Commissioner of Cruz's designation as QBE's authorized representative. *See* P.R. Laws Ann. tit.

26 §949l(2) (Puerto Rico law requires that the Office of the Insurance Commissioner be notified of the designation of authorized representative).[1]

      Although an agency relationship may also be implied and does not necessarily require a written contract, there is no evidence that QBE made an offer of authority to Cruz nor that he accepted an offer of authority from QBE such that Cruz should be considered QBE's agent. Cruz explained that while he considers both QBE and Morales as his clients, he started working with QBE because he was always "looking for options" for his clients. Transcript 6-28-18 AM at 69:9–12. He also wants to make sure that his clients, like Morales, get the best coverage and the best terms in the insurance market, which is why he negotiates with different insurance companies to get his clients the best deal possible. Transcript 6-28-18 PM at 6:9–21. This mentality does not reflect that Cruz sees himself as an extension of QBE or has such a loyalty to QBE that he considers himself "bound to perform services at the request of" QBE. *See Gonzalez-Gonzalez*, 581 F. Supp. 2d at 280. It is also not clear who would have requested that Cruz perform services for QBE since Cruz testified, "I don't know anybody at QBE" and that he barely does business with QBE. Transcript 6-28-18 PM at 11:1–5. In fact, Cruz appears to see himself as an advocate for the insured. When asked about his role in the application process for insurance, Cruz explained, "If the insured asks me for advice with the application, then I will advise them with the, with regard to the application, completing the application." Transcript 6-28-18 AM at 71:4–10. Cruz described his role in the claims process as, "Within the claim, I speak with the insured, and I take the details of the claim, and I forward that to the insurance company." Transcript 6-28-18 AM at 71:11–15. Morales's counsel then asked Cruz, "who are you representing when you take a claim from an

---

[1] Moreover, it does not appear that this is a dispositive issue as the Supreme Court of Puerto Rico has specifically differentiated between an authorized representative and a general agent, the latter of which has the authority to bind the principal. *Rodriguez de Oller v. Transamerica Occidental Life Ins. Co.*, 2007 TSPR 98, 2007 WL 1723369, at *4–5 (P.R. May 30, 2007) (an authorized representative "is the insured's advisor, who guides the insured . . . for the purpose of asserting his or her rights, and who on other occasions is the good man who amicably intervenes between the company and the insured to happily resolve the insurer's objections and reservations" whereas a general agent "stands in the shoes" of the insurer (internal quotations omitted)).

insured?", and Cruz responded, "the insured." Transcript 6-28-18 AM at 71:16–18. When asked

again, "Who are you representing when you receive an insurance, an insurance claim?", Cruz again

responded, "the insured." Transcript 6-28-18 AM at 72:7–11.

There is also no evidence that QBE intended itself to be bound by the actions of Cruz.

QBE's general agent, Colonial Insurance Agency had a "Producer Commission Statement" for

Cruz that reflected his commissions, payments, and deductions; it was an account of Cruz's rolling

account with QBE. Exhibit YY; Transcript 6-29-18 at 16:9–17:3. Notably, while Puerto Rico law

does not allow people who have an authorized representative license to act as a producer, QBE

still had Cruz's commissions listed as those of a producer. *See* P.R. Laws Ann. tit. 26 § 949i(6) (no

person shall be issued a license as both a producer and an authorized representative). Morales also

presented a general ledger reflecting the transactions related to business produced by Cruz at

Colonial Insurance Agency from 2006–2016, but it is of little use because there is no demarcation

of which, if any, of the transactions reflect business done with QBE as opposed to one of the other

insurance companies that Colonial represented. Exhibit E; Transcript 6-29-18 at 14:23–15:11,

17:18–23; Stipulated Facts at 69. And, specific to the insurance adjustment at issue in this case,

QBE always treated Cruz as a representative of Morales as opposed to QBE: unlike other QBE

independent contractors, he was not invited to internal QBE meetings, only to meetings where

Morales was also present. Exhibit 10; Transcript 7-13-18 at 14:18–15:1, 16:7–23:17.

I find that Cruz was not an agent of QBE during the adjustment of Morales's claim. There

were no other individuals brought forward at trial as alleged agents of QBE who knew about the

2010 grounding. QBE carried its burden of proof in showing that Morales did not disclose the

2010 grounding, a material fact that he knew but QBE did not. Thus, under the doctrine of

*uberrimae fidei*, the policy for Making Waves is voidable by QBE. Because only one nondisclosure

is required to void a policy under the doctrine of *uberrimae fidei*, I will not discuss QBE's

allegation that Morales's failure to list five of his previous boats is also a valid ground on which

to void his policy under *uberrimae fidei*. *See* Docket No. 212 at 69.

Morales argues that he has an equitable defense to QBE's assertion of the doctrine of *uberrimae fidei*: waiver. Docket No. 213 at 42. However, as discussed at length in my order denying summary judgment, Docket No. 134, unlike in contract law, the doctrine of *uberrimae fidei* does not incorporate the affirmative defense of waiver. *HIH Marine Servs., Inc.*, 211 F.3d at 1362 ("[*U*]*berrimae fidei* does not permit the use of the principles of waiver and estoppel to provide coverage where there has been a material misrepresentation on the application." (internal quotations omitted)); *SW Traders, LLC v. United Specialty Ins. Co.*, No. 09-CV-778, 2009 WL 5215762, at *8 (W.D. Wash. Dec. 29, 2009), *aff'd*, 409 F. App'x 96 (9th Cir. 2010). Consequently, Morales's arguments regarding the affirmative defense of waiver are immaterial.

### Warranty of Truthfulness

QBE also asserts that it has the right to void Morales's policy because Morales breached his insurance policy's warranty of truthfulness when he failed to disclose his prior boating experience on his application for insurance from QBE. Docket No. 212 at 57.

As there is no dispute that the insurance policy is a maritime insurance contract, "federal law controls the contract interpretation." *Leonor Veras*, 995 F. Supp. 2d at 77; *see Fed. Marine Terminals, Inc. v. Worcester Peat Co.*, 262 F.3d 22, 26 (1st Cir. 2001) (citing *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 26 (2d Cir. 1988) (turning to "principles of general maritime contract law to determine" the meaning of the contract). In *Norfolk S. Ry. Co. v. Kirby*, the Supreme Court made clear that courts must look to the plain language when interpreting a maritime contract and read the language "naturally." 543 U.S. at 31–32 (citing *Green v. Biddle,* 8 Wheat. 1, 89–90, 5 L.Ed. 547 (1823) ("[W]here the words of a law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded")). If the terms of the contract are ambiguous, i.e. "capable of more than a single meaning," only then may the court examine parol evidence. *Fed. Marine Terminals, Inc.*, 262 F.3d at 26–28 (quoting *Garza,* 861 F.2d at 27) ("the district court properly refused to consider evidence of any negotiations or extrinsic documents to alter that language" after finding that the contract language was unambiguous); *see CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 382 (2d Cir. 1982)

(citing Restatement (Second) of Contracts § 213 (1979)) ("The general rule is that the terms of an unambiguous, integrated contract may not be varied by parol evidence.").

"Under federal law, 'a breach of a promissory warranty in a maritime insurance contract excuses the insurer from coverage.'" *Leonor Veras*, 995 F. Supp. 2d at 77 (quoting *Lloyd's of London v. Pagán-Sanchez*, 539 F.3d 19, 24 (1st Cir. 2008)). This is true even if the breach was "collateral to the primary risk that is the subject of the contract." *Id*. (quoting *Pagán–Sánchez,* 539 F.3d at 24–26). The unambiguous language of QBE Application states that "[t]he information provided in the Application is *warranted by you to be true* and correct in all respects." Joint Exhibit II (emphasis added). Interpreting the plain language of the contract, it is clear that the QBE Application includes a warranty of truthfulness. *See Leonor Veras*, 995 F. Supp. 2d at 77 (finding that the insurance application, where the wording is nearly identical to Morales's QBE Application, was written such that it was "clear that the truthfulness of all representations made therein is warranted by the applicant and that incorrect answers constitute breach of that warranty"). As in *Leonor Veras*, Morales breached that warranty when he failed to tell the insurer "of the other vessels he had previously owned" and of his 2010 grounding.  *Id*. The QBE Application required Morales to "give details of boating experience by providing, in chronological order, list of boats owned or operated" and to provide "full details, including dates and amounts paid" of "any accidents or losses (even if no insurance claim was filed) in connection with any vessel you have operated, owned or was under your control[.]" Joint Exhibit II. Although Morales listed two vessels, he failed to list five other vessels that he now admits to previously owning or operating. Joint Exhibit I; Transcript 06-28-18 AM at 18:18–20:2. Morales also did not include the fact that he grounded a 40' Riviera Offshore yacht in January 2010 in Fajardo. Joint Exhibits II, X; Transcript 06-28-18 AM at 4:3–5.

The warranty of truthfulness was material to the risk assumed by QBE in issuing the policy. The QBE Application clearly states that the insurance policy would be "issued by [QBE] based upon and in reliance of the truthfulness and completeness of the answers provided herein." Joint Exhibit II. As explained earlier, a fact is material if it "can possibly influence the mind of a prudent

and intelligent insurer in determining whether it will accept the risk." *Halifax Trawlers, Inc.*, 495 F. Supp. 2d at 240 (quoting *Pesante*, 459 F.3d at 38). Here, the contract is unambiguous that the warranty is material as it states that QBE would rely on and be influenced by Morales's answers in determining whether to accept the risk of issuing an insurance policy. Moreover, the declarations page on the QBE Application, which Morales signed, includes an acknowledgement that "all questions asked herein request *material information* which is indispensable for QBE Optima Insurance Company's assessment of the risk subject of this application." Joint Exhibit II (emphasis added).

As the contract language is unambiguous, QBE is entitled to declaratory judgment as a matter of law that Morales's breach of the warranty of truthfulness renders the policy voidable unless Morales can mount an affirmative defense.

Morales raises two affirmative defenses to his breach of the warranty of truthfulness: estoppel and waiver. Unlike in the doctrine of *uberrimae fidei*, federal contract law does provide for both defenses. *Suydam*, 820 F.2d at 1510 ("[A]n insurer may be estopped from asserting a breach of warranty."); *Natures Way Marine, LLC*, 37 F. Supp. 3d at 1242 ("[C]ontract law recognizes that parties can waive breach of contract claims."); *see In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 214 (3d Cir. 2013) (allowing a party to raise equitable defenses in a maritime contract controlled by federal law).

"[G]rounded on a notion of fair dealing and good conscience," equitable estoppel "operates to preclude a party who has made representations of fact through his words or conduct from asserting rights which might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right." *Gibbs ex rel. Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 133 (3d Cir. 2002) (quoting *Marine Transp. Svcs. Sea-Barge Group, Inc. v. Python High Perf. Marine Corp.,* 16 F.3d 1133, 1138 (11th Cir. 1994) and *Oxford Shipping Co., Ltd. v. New Hampshire Trading Corp.,* 697 F.2d 1, 4 (1st Cir. 1982)).

Although Puerto Rico law governs "[b]ecause there is no established rule governing the doctrine of equitable estoppel in marine insurance contracts," federal common law and Puerto Rico law require the same elements for an estoppel claim. *Yu v. Albany Ins. Co.*, 281 F.3d 803, 811 n.9 (9th Cir. 2002); *see Littlefield*, 392 F.3d at 6 (1st Cir. 2004) (applying New Hampshire state law after noting that "general principles of contract law are used to interpret marine insurance policies"). Under federal common law, the party asserting equitable estoppel must prove: "1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment." *Pagane Mar. Ltd. v. Glingrow Holding Ltd.*, No. 07 CIV. 10726 (PKL), 2008 WL 276489, at *5 (S.D.N.Y. Jan. 31, 2008) (quoting *Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 725 (2d Cir. 2001)).

Puerto Rico has a doctrine that is "parallel to the doctrine of estoppel in English" called "doctrine of one's own acts." *CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 76 (D.P.R. 2006) ("The doctrine of one's own acts flows from Art. 7 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 7 (1993), which allows the court to interject equity principles in the absence of a specific applicable legal provision."). The doctrine of one's own acts applies when "a) A certain behavior of a subject, (b) that he has given life to a situation contrary to reality, that is, apparent and, through such appearances, may influence the behavior of others, and (c) that it be the basis of the trust of another party which has acted in good faith and that, for that reason, has acted in a manner which would cause him prejudice if his trust was defrauded." *Int'l Gen. Elec. v. Concrete Builders*, 4 P.R. Offic. Trans, 1221, 1229 (P.R. May 19, 1976); *see Santiago v. Ecolab, Inc.*, 303 F. Supp. 2d 51, 54 (D.P.R. 2004), *vacated and remanded on other grounds sub nom. Hernandez-Santiago v. Ecolab, Inc.*, 397 F.3d 30 (1st Cir. 2005) (to establish liability, plaintiff must prove "(a) specific conduct, (b) which has brought about an apparent situation contrary to reality and capable of influencing the conduct of others, and (c) another party who has acted in good faith and in reliance thereto would be prejudiced should its trust be defrauded"); *see also King v. TL Dallas & Co.*, 270 F. Supp. 2d 262, 267 (D.P.R. 2003) ("[T]he Puerto Rico Supreme

Court has upheld the use of equitable principles, particularly the doctrines of 'waiver' and 'estoppel', in the application or interpretation of insurance contract provisions.").

Morales argues that QBE must be estopped from voiding the policy based on Morales's breach of the warranty of truthfulness because QBE misrepresented to him that prior loss history and boating experience were not material facts that could lead to voiding the policy and Morales relied on that misrepresentation to his detriment because he assumed he had insurance when he did not. Docket No. 213 at 53. Morales alleges that QBE misrepresented to him that his prior loss history and boating experience would not be considered material facts by issuing and renewing policy OYP-0000746, which was based on the Optima Application where Morales left blank the questions that asked him to describe any prior boating history and "any accidents, claims or losses in connection with any vessel you have sailed, owned or was under your control." Exhibits M, P, R, HH. Furthermore, Casado wrote in an email that she based herself on that same policy when issuing the policy at issue in this case. Exhibit W. However, Morales does not provide any evidence that his choice to ignore the explicit admonitions in the QBE Application—that prior loss history and boating experiences were material facts—in favor of his assumptions based on QBE's handling of his other policy was made in good faith.

In the face of QBE's clear written policy delineating the importance of completing the QBE Application accurately, Morales had to present some evidence that QBE's conduct was capable of influencing him despite his reading of the policy, and that his reliance was in good faith. In *Rodriguez de Oller v. Transamerica Occidental Life Ins. Co.*, the Supreme Court of Puerto Rico found that an insurer was estopped from cancelling a life insurance policy based on the insured's failure to comply with the express payment terms of the contract when the insurer had unilaterally changed the manner of payment and kept the policy active by collecting the premium through monthly deductions for over a year; the insurer never sent a cancellation note; and the insurer's agent, who had the authority to "make decisions on the effectiveness of the policy" actually arranged for the payment of benefits to the insured's widow. 2007 TSPR 98, 2007 WL 1723369 at *7 (P.R. May 30, 2007). In comparison, Morales has not shown nearly the same level of good faith

reliance as he has merely pointed to QBE's decision to renew a separate policy even though Morales had failed to follow QBE's instructions and withheld his prior losses and boating experience. This is insufficient to tip the scales in his favor. For the same reasons, Morales has also failed to prove that his actions were reasonable. Morales's affirmative defense of estoppel is denied.

Applying Puerto Rico law, this court explained, "a waiver may be implied from any act or pattern of conduct by the insurer or its authorized agents which reasonably tends to create a belief in the mind of the claimant under the policy that a specified act will be unnecessary." *Metlife Capital Corp. v. Water Quality Ins. Syndicate*, 100 F. Supp. 2d 90, 96 (D.P.R. 2000) (internal quotations omitted). "The doctrine of waiver entails the intentional abandonment or voluntary relinquishment of a right or privilege." *Rodriguez de Oller v. Transamerica Occidental Life Ins. Co.*, 2007 TSPR 98, 2007 WL 1723369 at *6 (P.R. May 30, 2007) (citing *López v. Atlantic Southern Ins. Co.*, 158 D.P.R. 562 (2003); *Rosario v. Atl. Southern Ins. Co. of P.R.*, 95 P.R.R. 742 (1968)).[2] The waiver "may be express or implied, and may be manifested by conduct or by words, or by oral or written statements," but the insurer must know of "said right or privilege" and intend "to abandon it." *Id*.

Morales argues that QBE knew of his breach of the warranty of truthfulness and yet continued to adjust his claim thus abandoning its right to void the policy on that basis. Docket No. 213 at 48. Specifically, Morales argues that because Morales left the questions about prior losses and boating experience on the Optima Application blank and provided partial answers to the same questions on the QBE Application, QBE should have recognized and addressed the "inconsistency." *Id*. at 48–49. There is a hole in this logic, though: the blank answer in an application to Optima and the answer that Morales provided in his QBE Application are not inconsistent in the same way that a "yes" and a "no" to the same question would be. Morales has

---

[2] Notably, this is the same test as under federal law: "[w]aiver is the intentional relinquishment of a known right, and a party's intent to waive a right can be drawn from conduct that is inconsistent with the assertion of that right." *Natures Way Marine, LLC*, 37 F. Supp. 3d 1 at 1242.

presented no evidence that the two blank answers in the previous application should have triggered Casado to realize that Morales's answers in the QBE Application were incomplete and did not include his prior grounding and ownership of five other vessels. With no proof that QBE knew of the right it was allegedly abandoning, Morales cannot prove a waiver defense.

Morales's other grounds are similarly unavailing. QBE's records stated that Morales's owner experience was "Much Experience, More than 15 years." Joint Exhibit IX. Morales asks the court to then extrapolate that QBE knew of the other five boats that he owned presumably because calculations based just on the information in the QBE Application would have only connoted at most thirteen years of experience (the application was placed in 2014 and he listed a 2001 Riviera that he had owned). In addition to the fact that Morales cannot meet his burden of proof merely through guesswork, Morales's theory does not address that he also breached the warranty of truthfulness by failing to mention the 2010 grounding.

Morales next argues that QBE found out about the 2010 grounding in both November 2014 and May 2015 and that by failing to immediately void the policy, QBE waived its right to do so. In November 2014, Soto, Morales, and Cruz all met to discuss the adjustment of Morales's claim. Joint Exhibit X. The three parties' highly divergent and impeached testimony regarding that meeting left no clear evidence that Morales or Cruz told Soto about the existence of the 2010 grounding in any identifying specificity. *See* Transcripts 6-28-18 AM at 87:1–90:16; 6-28-18 PM at 8:1–25 (Cruz testified that Morales told Soto all about the 2010 grounding, which was in direct contradiction to his prior deposition testimony; that Morales and Soto debated their points; and that Morales told Soto that the claim would have been resolved already if it had been with MAPFRE); 6-28-18 AM at 28:19–35:21, 38:1–4 (As opposed to the February or May meetings, Morales remembered all of the details of what he said in the November meeting but could not remember what Soto or Cruz said except that Cruz told Soto that the claim would have been resolved already if it had been with MAPFRE and that Soto said nothing except that Morales could contest the adjustment offer when it was completed); 6-25-18 at 30:17–22 (Soto only remembered that Morales said that the vessel should be declared a total loss, that he did not want the vessel

anymore, and that if the claim had been with MAPFRE it would have been resolved already). While all three witnesses agree that someone told Soto that if the claim had been with MAPFRE, it would have been over already, there was no reliable evidence that QBE was put on notice at the November meeting that Morales had a claim with MAPFRE stemming from his 2010 grounding.

In May 2015, the parties both agree that Jimenez told Soto about a rumor he had heard that Morales had a previous grounding claim with MAPFRE and that Soto then immediately told Rios to investigate the rumor. Joint Exhibit X; Transcripts 6-25-18 at 32:14–16, 51:4–12; 6-28-18 PM at 45:13–17. Rios emailed Soto in July to report that Morales had in fact grounded a vessel in 2010. Joint Exhibit X; Exhibit BBB. In the interim, QBE had been working to continue to try to rectify the differences in opinion between it and Morales on how to repair Making Waves. Transcript 06-27-18 at 18:4–19:23, 20:12–15, 23:6–11. While it may have been better for Rios to conduct his investigation in a more expedited fashion, Morales presented no evidence that the delay from May to July created a reasonable belief in his mind that QBE no longer cared about his prior loss history nor that the delay evinced QBE's intention to waive their interest in his prior loss history. *See Metlife Capital Corp.*, 100 F. Supp. 2d at 96. As such, Morales's waiver defense is under-developed and fails to meet his burden of proof.

Consequently, Morales breached the warranty of truthfulness in the QBE Application and policy by failing to disclose his prior loss history and his prior boating experiences. His breach gives QBE the right to void the policy for Making Waves.

Morales alleges that he is entitled to attorney's fees because of QBE's unfair claim adjustment practices or actions as delineated in P.R. Laws Ann. tit. 26 § 2716a. Because QBE has the right to void the policy from its inception and thus Morales had no coverage for Making Waves, "it necessarily follows that [Morales] [i]s not entitled to damages for [QBE]'s allegedly tortious acts in refusing to pay the claim" under federal or Puerto Rico law. *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 34 (2d Cir. 1999); *see Oriental Fin. Grp., Inc. v. Fed. Ins. Co.*, 598 F. Supp. 2d 199, 227 (D.P.R. 2008) ("The Court clarifies it is aware that under Puerto Rico law, there is no specific statute providing a cause of action for bad faith refusal to settle a

claim. . . . As such, although the 'dolo' claim is not a separate 'cause of action,' it is contingent upon the breach of contract claim (in this case, wrongful refusal of coverage)."); *Certain Interested Underwriters at Lloyd's, London v. Bear, LLC*, 259 F. Supp. 3d 1050, 1061–62 (S.D. Cal. 2017) ("Because the Court concludes that Bear was not entitled to coverage for the Polar Bear's loss, it necessarily follows that Bear is not entitled to damages for Underwriters' alleged breach of contract and tortious conduct in refusing to pay for damages relating to the Polar Bear's total loss.").

In addition, as Morales cannot show that QBE lacked a reasonable basis for denying his claim, to prevail in maintaining a claim for a bad faith adjustment by QBE, Morales must prove that QBE's conduct "denoted 'either conscious wrongdoing [or] reckless indifference." *King v. TL Dallas & Co.*, 270 F. Supp. 2d 262, 270 (D.P.R. 2003) (quoting *Event Producers, Inc. v. Tyser & Co. N. Am., Inc.*, 854 F. Supp. 35 (D.P.R. 1993), aff'd 37 F.3d 1484 (1st Cir. 1994) (noting that the court places "particular emphasis on the willful nature of the insurer's failure to pay on the claim" when analyzing the insured's duties under P.R. Laws Ann. tit. 26 §§ 2716a and 2716b)). Morales presented no evidence at trial of QBE's conscious wrongdoing or reckless indifference during the adjustment process. Although he points to the difference in amount in the three offers as proof that QBE was engaged in bad faith adjusting, both parties agree that QBE based its offers on estimates of damages provided by different contractors, namely Jimenez and Island Marine. Joint Exhibit V, VIII, X; Exhibit 31; Transcripts 6-25-18 at 27:4–15; 6-26-18 at 24:1–13; 6-28-18 at 28:11–20. With no evidence that QBE's decision to rely on experts to conduct damage reports and then make its offer based on those reports was in bad faith, Morales's claim fails.

Finally, Morales argues that QBE engaged in bad faith post-claim underwriting by only investigating an application for a policy after the policy is granted and a claim has been filed rather than before the policy was granted. Docket No. 213 at 63. In addition to the fact that Morales has no basis for his claim of bad faith given that there is no contract between QBE and Morales under which to bring it, Morales's arguments also run counter to the doctrine of *uberrimae fidei*, which requires the insured "to place the underwriter in the same situation as himself; to give to him the

same means and opportunity of judging of the value of the risks." *State Nat. Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1351 (S.D. Fla. 2011) (quoting *Sun Mut. Ins. Co.*, 107 U.S. at 510–11). In maritime law, the insurer is not obligated to go out and do its own research into the validity of the insured's claims in his application; instead, the insured is responsible for making a "full disclosure of all material facts" to the insurer. *Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc*., 974 F. Supp. 2d 64, 78 (D.P.R. 2013) (quoting *Grande v. St. Paul Fire & Marine Ins. Co.,* 436 F.3d 277, 283 (1st Cir. 2006)). The evidence show that QBE relied on the facts presented by Morales to issue his policy; under *uberrimae fidei*, Morales cannot now argue that QBE should have investigated the information he presented to see whether or not it was true.

## CONCLUSION

For the foregoing reasons, QBE is entitled to a declaratory judgment as a matter of law, as Morales's breach of the doctrine of *uberrimae fidei* and of the warranty of truthfulness placed QBE in a peculiarly difficult position to assess the risks involved in insuring the vessel. Accordingly, QBE's action for declaratory judgment is **GRANTED**; QBE is excused from payment on any losses under policy OYP-00001077. Morales's claims are **DISMISSED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 7th day of August, 2018.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge